United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH VARGAS,<br><br>    Petitioner,<br><br>    v.<br><br>BEN CURRY, warden,<br><br>    Respondent.<br>_____/ | No. C 08-4748 MHP (pr)<br><br>**ORDER GRANTING HABEAS PETITION** |

## INTRODUCTION

Joseph Vargas, formerly an inmate at the Correctional Training Facility in Soledad and now at the California Men's Colony, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be granted.

## BACKGROUND

Vargas pled guilty and was convicted in Fresno County Superior Court of second degree murder for a killing in 1979. He was sentenced to 15 years to life in prison in 1980. His habeas petition does not challenge his conviction but instead challenges a July 19, 2007 decision by the Board of Parole Hearings ("BPH") that found him not suitable for parole. In his case, the BPH panel of two commissioners reached a split decision – with one commissioner finding him suitable and the other finding him not suitable. The matter then went to the full BPH, which found him not suitable for parole.

The BPH identified the circumstances of the commitment offense, Vargas' criminal history, his disciplinary history, and a problem with the psychological evaluation as the reasons for the decision that Vargas' release would pose an unreasonable risk of danger to society.

Vargas sought relief in the California courts. The Fresno County Superior Court denied his petition for writ of habeas corpus in a reasoned decision. The California Court of Appeal and California Supreme Court summarily denied his petitions for writ of habeas corpus.

Vargas then filed his federal petition for a writ of habeas corpus. The court found cognizable his claim that his right to due process was violated because the evidence was insufficient to support the BPH's decision that he was unsuitable for parole. Respondent filed an answer and Vargas filed a traverse.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns the execution of the sentence of a prisoner then housed at a prison in Monterey County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claim asserted in the petition.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

2

The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000).  Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole.  See Hayward v. Marshall, 603 F.3d 546, 563 (9th Cir. 2010) (en banc); Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

## DISCUSSION

A.   State Law Standards For Parole For Murderers In California

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years.  A first degree murder conviction yields a minimum term of 25 years to life and a second degree murder conviction yields a minimum term of 15 years to life imprisonment.  See In re Dannenberg, 34 Cal. 4th 1061, 1078 (Cal. 2005); Cal. Penal Code § 190.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates."  Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal. Penal Code § 3041(b).

3

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[1] The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal. Code Regs. § 2402(b).

The regulations contain a matrix of suggested base terms for several categories of crimes. See 15 Cal. Code Regs. § 2403. For example, for second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime. The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity. Dannenberg, 34 Cal. 4th at 1070-71. Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole. Id. at 1070-71; 15 Cal. Code Regs. § 2403(a).

The "Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety . . . [T]he core determination of 'public safety' under the statute and corresponding regulations involves an assessment of an inmate's current dangerousness." In re Lawrence, 44 Cal. 4th 1181, 1205 (Cal. 2008)(emphasis in source). Where "evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide

4

1 'some evidence' inevitably supporting the ultimate decision that the inmate remains a threat to
2 public safety." Id. at 1191 (emphasis in source).

3 B.      Federal Habeas Relief On Parole Denial Claims

4        The U. S. Constitution's Due Process Clause does not itself provide state prisoners
5 with a federal right to release on parole. Hayward v. Marshall, 603 F.3d 546, 562 (9th Cir.
6 2010) (en banc).  The substantive law of a state might create a right to release on parole,
7 however. See id. at 555, 559.  Although Hayward purported not to reach the question
8 whether a California's substantive law created a federally protected liberty interest, see id. at
9 562, later cases from the Ninth Circuit have said or assumed it does.  See Pearson v. Muntz,
10 606 F.3d 606, 609 (9th Cir. 2010) ("state-created rights may give rise to liberty interests that
11 may be enforced as a matter of federal law. . . .  By holding that a federal habeas court may
12 review the reasonableness of the state court's application of the California 'some evidence'
13 rule, Hayward necessarily held that compliance with the state requirement is mandated by
14 federal law, specifically the Due Process Clause." ); Cooke v. Solis, 606 F.3d 1206, 1213
15 (9th Cir. 2010) ("In Hayward, we held that due process challenges to California courts'
16 application of the 'some evidence' requirement are cognizable on federal habeas review under
17 AEDPA"); id. ("we must examine the nature and scope of the federally enforceable liberty
18 interest created by California's 'some evidence' requirement"); see also Pirtle v. California
19 Board of Prison Terms, 611 F.3d 1015, 1020 (9th Cir. 2010) ("'California's parole scheme
20 gives rise to a cognizable liberty interest in release on parole.' McQuillion v. Duncan, 306
21 F.3d 895, 902 (9th Cir 2002).  That liberty interest encompasses the state-created
22 requirement that a parole decision must be supported by 'some evidence' of current
23 dangerousness. Hayward [603 F.3d at 562-63.]")  Hayward's application and these later
24 cases make it clear that in the Ninth Circuit there is federal habeas relief available under §
25 2254 for California prisoners denied parole without sufficient evidence, although it now
26 appears that the emphasis has shifted from § 2254(d)(1) to § 2254(d)(2).

27      A federal district court reviewing a California parole decision "must determine
28 'whether the California judicial decision approving the governor's [or the Board's] decision

1    rejecting parole was an 'unreasonable application' of the California 'some evidence'
2    requirement, or was 'based on an unreasonable determination of the facts in light of the
3    evidence.'" Hayward, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2)).  That
4    requirement was summarized in Hayward as follows:

> As a matter of California law, "the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety."  There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety."  The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre- or post- incarceration history, or his or her current demeanor and mental state" supports the inference of dangerousness. [¶]  Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, "a current threat to public safety."

11   Hayward, 603 F.3d at 562 (footnotes omitted) (quoting Lawrence, 44 Cal. 4th. at 1210, 1213-
12   14); see also Cooke, 606 F.3d at 1216 (describing California's "some evidence"
13   requirement).
14          When a federal court considers a habeas case directed to a parole decision, the
15   "necessary subsidiary findings" and the "ultimate 'some evidence' findings" by the state
16   courts are factual findings – and thus are reviewed by the federal court under 28 U.S.C. §
17   2254(d)(2) for whether the decision was "based on an unreasonable determination of the
18   facts in light of the evidence." Cooke, 606 F.3d at 1214 (citing Hayward, 603 F.3d at 563).
19   C.     Vargas' Case
20          1.     His Circumstances
21          Commitment offense:  Vargas killed the victim during a robbery in March 1979.  The
22   victim's body was found in an alley in Fresno, with his front pants pocket turned inside out.
23   "The postmortem examination revealed that the victim had a cut on the inside of his mouth,
24   and slight bruising about the facial area.  There was also multiple trauma and hemorrhaging
25   to the muscles of the chest and the rib area.  He had sustained several ruptures to the
26   peritoneum artery, filling the abdomen with blood.  The pathologists stated that artery being
27   torn in more than one place indicated that the victim had suffered more than one blow to the
28   body.  He stated that a sharp blow with extreme force would be necessary to inflict this type

6

of injury, and he believed there was a strong possibility that the victim had marked Sclerosis of the Liver, although death was caused by the trauma which had ruptured the peritoneum artery, causing heavy bleeding. The victim's blood alcohol was .37." Resp. Exh. 1 at Exh. 5 (Life Prisoner Evaluation Report for April 2006 Calendar), p. 1; 7/19/07 BPH hearing reporter's transcript ("RT") 16-17.  Vargas had met the victim on a Greyhound bus and they went to a bar for a drink at a bus stop. Vargas asked the victim to watch his clothes and bag while Vargas used the restroom; when Vargas returned, his items were missing and Vargas felt the victim was responsible for his losses, even if the victim didn't personally take them. Vargas decided to rob the victim. He lured him out of the bar, and beat him up during the course of a robbery in an alley. (The victim did not have Vargas' property, but did have other property which Vargas then stole.) Vargas was arrested on May 22, 1979, more than two months after the killing.   A couple of weeks before his arrest, Vargas committed an armed robbery of a drug store. He stated that he had committed the robbery for the purpose of obtaining money to buy drugs.  RT 18-24.

<u>Pre-Commitment Criminality</u>:  Before committing the murder, Vargas had a lengthy criminal record, starting when he was 13 years old and continuing up until his arrest for the murder when he was about 38 years old. His juvenile record included arrests and punishment for petty theft in 1954, theft in 1955, "lack of supervision" in 1955, and a drug offense in 1957. As an adult, he was convicted of second degree burglary in 1959; assault and battery in 1962; robbery and a drug offense in 1962; first degree robbery and being a felon in possession of a firearm in 1962; passing a forged check in 1967; possession of a controlled substance (heroin) in 1975; and escape from a county facility without force in 1975.

<u>In-Custody Behavior</u>: On an earlier stay in state prison, Vargas had been in a gang but dropped out before July 1974 – more than 30 years before the parole decision in question. Resp. Exh. 1 at Exh. 5 (Life Prisoner Evaluation Report for April 2006 Calendar), p. 4. Vargas had received four CDC-115s, the last of which was in 1992. He had received six or seven CDC-128s, the last of which was in 2006.

<u>In-Custody Accomplishments</u>: Vargas had "earned above average to exceptional work grades per his work supervisor report dated 2/1/05. He is presently assigned to the P.I.A. Wood Furniture Factory as a Furniture Finisher. His supervisor's comments are: Inmate Vargas continues to have a great attitude and has work ethics." Life Prisoner Evaluation Report for April 2006 Calendar, p. 5.

<u>Parole Plans</u>: Vargas planned to live with his sister in Fresno, California. He had no confirmed job offers, but had marketable skills. He was a handyman and was willing to put his marketable skills to work.

<u>Psychological Evaluation</u>: Vargas had received a favorable psychological evaluation.

> In considering potential for dangerous behavior when released to the community, Mr. Vargas is not at all the same person he was when he committed the commitment offense. At this point in his life he is older, mature, stable and responsible. He is 65 years of age. Research done on inmates shows that at this age they are not at all inclined to re-offend or even to violate parole. As a result, he is no more dangerous than the average citizen in the community. In fact, based upon his life experiences, his gains and understanding, he probably is less dangerous than the average citizen in the community.

7/6/06 Mental Health Evaluation, p. 4. The BPH had a concern about the mental health evaluation omitting Vargas' most recent counseling chrono (in 2006 for not sitting up for head count). The BPH cannot rely on the deficiency in the report that was not of the inmate's doing as evidence of current dangerousness. Cf. Cooke, 606 F.3d at 1215 ("A properly disregarded piece of favorable evidence, however, cannot possibly constitute evidence of current dangerousness.")

   2.   BPH's Decision And State Court Review

At Vargas' hearing, the result was a split decision, with one commissioner favoring and the other commissioner opposing parole. The matter then went to the full BPH, which voted unanimously to find Vargas "unsuitable for parole for the reasons articulated by the Commissioner at the July 19, 2007 hearing." Resp. Exh. 1 at Exh. 1 (10/24/07 BPH decision). Thus, the reasons of the individual commissioner who thought Vargas unsuitable must be considered. That commissioner found that the commitment offense was especially cruel and callous in that Vargas beat to death a victim who must have been vulnerable because of his high blood alcohol level; that he had lured his victim outside the bar and

8

attacked him in an alley, where he beat him and left him to die. The commissioner noted that, even after the killing, Vargas was not deterred and committed an armed robbery of a drug store a couple of months later. The commissioner also relied on Vargas' extensive history of criminality, history of unstable relationships; disciplinary record in prison; and a need for an updated psychological report that took into account a CDC-128 issued to Vargas in 2006. RT 105-110. That commissioner noted that, aside from the CDC-115s and CDC-128s, Vargas "has programmed commendably. He has been participating in some programs, again, specifically vocational and the PIA, where he's working in the wood furnishing which is very positive for him." RT 109. That commissioner also found that Vargas has "a viable residential plan to live in Fresno County" with his sister and had marketable skills that he could apply. RT 112. The commissioner was concerned that "there seems to be a little bit of lack of preparation for substance abuse and relapse prevention programs" that Vargas would attend if paroled, which was a bigger concern because Vargas had been institutionalized most of his life. RT 112-13. She also found that he needed further self-help, although he had resumed NA and was "on the right track." RT 114.

The other commissioner thought Vargas <u>was</u> suitable, and said that she agreed "with 99% of what the Commissioner said. What we disagree on primarily is what to emphasize, or the weight that we're putting on different aspects of what was presented today." RT 116. She noted that the psychological evaluation was deficient, but that was something "which you do not control," RT 117. She also stated that Vargas had done close to 30 years for the crime and was now 65 years old. "That was a consideration in my mind for a number of reasons. One, is that I think if we delay your parole too long, it will make it more difficult. You'll have no family, then you'll be before us with no letters [of support]." RT 117-18. She was very impressed that Vargas had been able to live in a dorm for more than ten years without any disciplinary offenses which were "ordinarily associated with that." RT 118. She found that he had participated in self-help and therapy; she found him to be "insightful and mature and functional;" and she found remarkable that this 65-year old inmate had received such favorable work evaluations, especially for interpersonal skills. RT 118. "I also think

that you have demonstrated and that psychological evaluations indicate that you've demonstrated maturation, growth, a greater understanding of both yourself and the crime." RT 119.  She stated that she and the other commissioner differed as to whether Vargas had realistic parole plans; she thought he did.  RT 119.  She also noted that the psychologists had said since his earlier days in prison that Vargas had changed the nature of his character over time.  RT 121.  By her calculations, Vargas' total period of confinement would be 152 months if found suitable.  RT 122.  She also would have put several special conditions of parole on him.  RT 122-123.

The Fresno County Superior Court upheld the BPH's decision in a reasoned decision. As the last reasoned decision from a state court, that is the decision to which § 2254(d) applies.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).   The superior court found that some evidence did support the BPH's conclusion that Vargas was not suitable for parole based on the applicable factors. The court articulated the some evidence standard and found that "there was at least some evidence that releasing petitioner would pose an unreasonable risk to society or a threat to public safety because of the violent nature of the original offense, petitioner's criminal conduct before the murder, and petitioner's multiple disciplinary reports since becoming incarcerated."  Resp. Exh. 2 at 2. With regard to the disciplinary record, the court explained that Vargas had received four serious rule violation reports (i.e., CDC-115s) and seven less serious counseling chronos (i.e., CDC-128s).  "His most serious violation was in 1992, but he did receive a less serious counseling memo in July of 2006, which tends to show that he may still have disciplinary problems."

3. Analysis Of Habeas Claim

The superior court's rejection of Vargas' petition was an unreasonable determination of the facts and an unreasonable application of the California "some evidence" requirement. See Cooke, 606 F.3d at 1216 ("When habeas courts review the 'some evidence' requirement in California parole cases, both the subsidiary findings and the ultimate finding of some evidence constitute factual findings.").  The problem with the decision here is not so much

10

the historic circumstances found to exist but instead is with the nexus between the circumstances relied upon and the ultimate determination of current dangerousness.

The circumstances of the commitment offense show that this murder just barely qualifies as one committed in "an especially heinous, atrocious or cruel manner." Vargas did lure the victim outside the bar, which was a place of relative safety, but the evidence indicates Vargas lured him out to rob him and not to kill him. The evidence in the record shows that Vargas kicked and punched the victim in the course of a robbery and then left him for dead. The motive was the all-too-common one of robbery, which is trivial in relation to the taking of a human life but is not inexplicable nor unusual.

Vargas has accepted responsibility for the crime for decades, with no excuses or hedging. Vargas accepted responsibility for the crime when he entered his guilty plea in 1980. His description of the crime has remained quite consistent since that time. For example, in 1980, he agreed with the court's statement that the factual basis for the guilty plea was that he struck the victim with his fist "three or four times in the abdominal region and that [Vargas] struck him for purposes of incapacitating him so that [Vargas] could rob him and that [Vargas] then took his property." Resp. Exh. 1 at 1/24/80 RT 8. He admitted at the time that there was no sort of self-defense involved in his actions. Id. at 9. At the same time, he admitted that he had committed an armed robbery at the drug store several months later. Id. at 12. He expressed apparent genuine remorse at that change of plea hearing. Id. at 16. There was plenty of evidence to support the determination that Vargas had an escalating pattern of criminal behavior before the murder. But the probative force of that criminality fades with time and good behavior. His criminal record showed also that he had a problem with substance abuse, but he has remained clean and sober for more than two decades, and has participated in a 12-step program in prison.

The biggest concern for Vargas is his disciplinary history in custody. Vargas did have the disciplinary history to which the superior court referred. He received serious rule violations for (1) involvement in an altercation in 1984; (2) refusal to work in 1985; (3) possession of stimulants and sedatives in 1986; and (4) possession of contraband/dangerous

property in 1992.  See Life Prisoner Evaluation Report for April 2006 Calendar, p. 5.  He received counseling chronos for (1) involvement in a physical altercation in 1984; (2) some kind of interference with the head count in 1986; (3) an unexcused absence in 1992; (4) having clothing/linen hanging around his bunk area in 1997; (4) violation of a dorm policy rule in 2002; (5) some kind of interference with the head count in 2005; and (6) not sitting up for count in 2006.  The minor rule infractions that led to the counseling chronos certainly don't count in his favor, but their probative value as to his current dangerousness is minimal.  The last serious disciplinary offense had taken place in 1992, fifteen years before the parole decision was made.  The age of the serious disciplinary infractions makes their probative value on the ultimate question diminish.  This is especially true for this inmate who had lived in a dorm setting, which was an especially difficult place in which to thrive because of the potential for interpersonal conflict – a point made by both inmate and a commissioner.  See RT 62, 118.

In about 1980, it would have been completely reasonable to find Vargas currently dangerous in light of the murder and his extensive criminal record.  In 2007, the opposite was true, in light of the passage of 27 years plus his institutional behavior that showed strong evidence of rehabilitation.   The inmate was not a sophisticated man, and his verbal expressions of his thoughts were not particularly eloquent.  But what does come through in the hearing transcript and the psychologist' evaluation is that Vargas was genuine – genuine in his remorse for the killing he committed, genuine in his efforts to improve himself, and genuine in his desire to be a good citizen if released from custody.  He was 65 at the time of the hearing, and at that age it was statistically not likely that he would re-offend, according to the psychologist.  He candidly admitted that substance abuse was a major problem in his earlier days.  He addressed that by participating in AA and NA during his incarceration.  He also believed that drugs simply could not be a part of his future, as he thought they would mean an automatic return to prison for the rest of his life.  He demonstrated his commitment to avoiding substance abuse by remaining clean and sober since about 1985.  He had fine work reports from his prison jobs and had excellent people skills.  He also had a favorable

1 psychological evaluation.  He had a supportive family on the outside; his sister and daughter
2 offered to provide housing and support if he was released on parole.  He had marketable
3 welding, carpentry and painting skills.  He was realistic and enthusiastic about working if
4 released and had the attitude that he would take any job available.  His parole plans were
5 somewhat lacking in that he had not investigated the whereabouts of substance abuse
6 avoidance programs that would be available to him, but that information can be quickly
7 obtained.   The passage of time and Vargas' maturation and progress in prison show this to
8 be a case where there is not some evidence to support the determination that he is currently
9 dangerous if released on parole.   The state court's denial of Vargas' petition was an
10 "'unreasonable application'" of the California "some evidence" requirement and was based on
11 an "'unreasonable determination of the facts in light of the evidence.'"  Hayward, 603 F.3d at
12 562-63 (quoting 28 U.S.C. 2254(d)(1)-(2)); see also  Cooke, 606 F.3d at 1216 ("there was no
13 evidence that reasonably supports either the necessary subsidiary findings or the ultimate
14 'some evidence' finding.").  The petition for a writ of habeas corpus is granted.

15  In its split decision, the BPH commissioner calculated Vargas' term.  She explained
16 that his total base life term was 252 months, that he received post-conviction credits of 100
17 months, and therefore had a total period of confinement of 152 months.  RT 122.  Having
18 been in prison for more than 27 years at the time of the hearing, Vargas was well past that
19 total period of confinement.  Accordingly, Vargas is entitled to release from custody.
20 See Pirtle, 611 F.3d at 1025.
21 / / /
22 / / /

**CONCLUSION**

The petition for a writ of habeas corpus is granted. Within thirty days of the date of this order, the California Board of Parole Hearings must calculate a term for petitioner and set an imminent date for his release in accordance with Section 3041(a) of the California Penal Code. In calculating his parole term, petitioner should be given credit for the time period from the July 19, 2007 hearing date to the date of petitioner's release from prison.

The clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: September 9, 2010

Marilyn Hall Patel
United States District Judge

## **NOTE**

1.     The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).